# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

CHRISTOPHER A. SUMMERS,

        Petitioner,        :   Case No. 3:16-cv-387

  - vs -                         District Judge Thomas M. Rose
                                   Magistrate Judge Michael R. Merz

CHARLOTTE JENKINS, Warden,
Chillicothe Correctional Institution,

                            :

        Respondent.

# REPORT AND RECOMMENDATIONS

      This habeas corpus case is brought by Petitioner Christopher Summers with the

assistance of counsel to obtain relief from his conviction in the Mercer County Common Pleas

Court on eight counts of sexual battery in violation of Ohio Revised Code § 2907.03(A)(7).  He

pled guilty to those charges and was sentenced to twenty years year imprisonment.  In response

to the Petition, the Warden has filed the State Court Record (ECF No. 7) and a Return of Writ

(ECF No. 10).  Mr. Summers has completed the pleadings with a timely Reply (ECF No. 15).

      Summers pleads the following grounds for relief:

> **Ground One:**  Trial counsel provided ineffective assistance in
> plea bargaining in violation of the Sixth Amendment.
>
> **Supporting Facts:**  Trial counsel provided affirmative
> misrepresentations of law in order to persuad [sic] Summers to
> plead guilty; promised Summers he would receive a sentence less
> than one-tenth of what he actually received if he plead [sic] guilty,
> even though counsel had no good faith basis for believing
> Summers would receive lenience; refused to cross-examine the
> alleged victim before advising Summers to plead guilty mid-trial,

leaving the trial court with the unchecked impression that the witness's testimony was entirely true when it was not; and improperly advised Summers' family and friends that his sentence would be much lower in order to coerce him to plead rather than proceed with his jury trial.

**Ground Two:**  Trial counsel provided ineffective assistance at sentencing in violation of the Sixth Amendment.

**Supporting Facts:**  Trial counsel failed to introduce text message logs, cell phone records, a medical expert report regarding an alleged wound on the victim's ankle, and other favorable evidence at Summers' sentencing hearing.  Summers' attorneys also failed to call numerous favorable witnesses on his behalf at sentencing.

**Ground Three:**  Summers' direct appeal attorney provided ineffective assistance of counsel in violation of the Sixth Amendment.

**Supporting Facts:**  Summers' direct appeal attorney failed to raise a meritorious claim regarding on-the-record ineffective assistance of trial counsel based on trial counsel's failure to object to the use of the term "rape" when Summers was not charged with rape, as well as the failure to object to other prejudicial evidence, the failure to file a motion to dismiss duplicative an non-specific counts in the indictment, the failure to challenge the constitutionality of the Ohio sexual battery statute, and the failure to raise a proportionality argument at sentencing.

**Ground Four:**  Summers' 20-year sentence was disproportionate in violation of the Eighth Amendment.

**Supporting Facts:**  Summers' 20-year sentence vastly exceeded the sentences imposed by [sic] similarly-situated offenders and was therefore disproportionate in violation of the Eighth Amendment.

**Ground Five:** The Ohio teacher-student sexual battery statute under which Summers was convicted violates the equal protection guarantee.

**Supporting Facts:** Ohio's sexual battery statute specifically penalizes teachers, administrators, coaches, and other adults working in public schools for an act which, if committed by other adults not employed in schools, is not illegal. This disparate treatment under the law does not survive rational basis review. There exists no legitimate government interest in prohibiting some

2

adults from engaging in consensual sex with students, while not preventing all adults from this behavior. Neither is the statute rationally related to the goal of protecting students from sexual advances by adults in authority, because it excludes wholesale categories of adults who may engage in this behavior.

(Petition, ECF No. 1.)

## Procedural History

Petitioner Summers was indicted by the Mercer County, Ohio, grand jury on February 21, 2013, on two counts of rape, forty-two counts of sexual battery, two counts of felonious assault, one count of gross sexual imposition, and one count of attempted sexual battery, all against the same minor victim (State Court Record, ECF No. 7, PageID 30-50). The two counts of raped were dismissed, but trial proceeded on the remaining counts until Summers entered into a waiver of constitutional rights and a written plea agreement in which he agreed to plead guilty to eight counts of sexual battery. *Id.* at PageID 56-59. The trial judge then imposed an aggregate sentence of twenty years imprisonment. *Id.* at PageID 66.

Summers filed a direct appeal to the Ohio Third District Court of Appeals. That court found the relevant facts to be as follows:

> [*P6] The case subsequently proceeded to a jury trial on the remaining counts against Summers. At trial, the victim testified that she first met Summers while she was a high school student at Fort Recovery. [footnote omitted](Tr. at 6). Summers was the victim's study hall monitor her freshman year of high school, and he had taught the victim's brothers while they were in school. During the victim's sophomore year of high school, Summers taught her accounting class and he was her JV basketball coach. Summers was also a track coach, and the victim ran track.

> [*P7] The victim testified that her sophomore year she began occasionally babysitting Summers' kids while Summers and his

wife went out. She also testified that she tore her ACL her sophomore year during basketball season, and wanting to continue helping out with the team, she assisted Summers with scouting reports. The victim testified that it was around this time that Summers began to send her text messages and began asking her to come down to see him during study hall. (Tr. at 12).

[*P8] The victim testified that Summers started "meddling" in the personal lives of the players on his team, including hers. (Tr. at 13). She testified that Summers would pull her into the "show choir room" at school to talk and threatened detentions if she would not meet him. (*Id.*) The victim testified that Summers began sending her text messages on the weekends asking her if she was "behaving." (Tr. at 13). The victim testified that Summers would message her about girls in practice and communicate with her about her friends. She testified that Summers was "nosy." (Tr. at 16).

[*P9] The victim testified that in the summer of 2010, a few weeks after school concluded her sophomore year, Summers and his wife asked her to go on a trip to the Outer Banks in North Carolina with them to babysit their children. (Tr. at 18). The victim testified that despite her reservations regarding Summers, she liked his children and had never seen the ocean so she agreed to go along. (*Id.*)

[*P10] The victim testified that there were multiple incidents on the trip that made her feel uncomfortable but other than a hug nothing physically happened on the trip. (Tr. at 22). The victim testified that Summers sent her a message after the trip apologizing for his demeanor. (*Id.*)

[*P11] The victim testified that later that same summer she went to a basketball camp that Summers also attended. The victim testified that on one evening many of the members of the team were in her room, and that after they left, Summers lingered asking her about her issues with her friends. (Tr. at 24).

[*P12] The victim testified that on June 28, 2010, shortly after the basketball camp was over, she was contacted by Summers' wife to babysit the children for the day. (Tr. at 26). The victim testified that Summers came home while she was still babysitting and told her that he wanted to pay her and that he had to show her something. (Tr. at 26). The victim testified that she followed Summers to his bedroom where Summers shoved her onto the bed. (Tr. at 26). The victim testified that Summers had his hands locked on her arms and that she told Summers to get off of her. (Tr. at 27).

4

The victim testified that Summers told her that he loved her and that she was his "little puzzle piece." (*Id*.)

[**P13**] The victim testified that Summers told her he wanted to show her he loved her so he took the victim's clothes off and digitally penetrated her. (Tr. at 27). The victim testified that she "was telling him [she] didn't want it and for him to get off [her] and let [her] go." (Tr. at 27). The victim testified that Summers then put a condom on and had sexual intercourse with her. (Tr. at 29). The victim testified that afterward Summers instructed her not to tell anyone because Summers was in "control and that he could do anything he wanted to [her], and [she] had no idea what kind of man he was and what he was capable of doing to [her] and that he would go to great lengths to make sure that [she] never told." (Tr. at 29-30).

[**P14**] The victim testified that Summers then waffled back and forth between telling her that he was "so glad that he got to take [her] virginity and that it meant everything to him, that [she] was so special" to "telling [her] that he could do anything he wanted to [her] and that he made sure that he had the control." (Tr. at 30). After the incident, Summers instructed the victim to get her clothes and go.

[**P15**] The victim testified that Summers sent her text messages on her way home after the incident further instructing her not to tell anyone. She testified that she was too scared and embarrassed to tell anyone. She testified that she also felt responsible because she had a feeling she should not have gone over to babysit but went over anyway. (Tr. at 31-32).

[**P16**] The victim testified that in the days following the incident Summers continued messaging her saying that he wanted to see her and she avoided him as much as she could. (Tr. at 33). The victim testified that she made every excuse she could to put off meeting Summers, but that Summers kept reminding her that she "was under his control and that he had the power and that he was capable of doing anything to keep [her] quiet." (Tr. at 34). The victim testified that at one point after dinner on July 3, 2010, she received 10 messages in a row from Summers, and that Summers then called her and said that she had to "meet him or * * * pay the consequences." (Tr. at 34).

[**P17**] The victim testified that she met Summers at the "Saint Henry * * * ball diamond" in the first-base dugout following a wedding she was attending. (Tr. at 35). The victim testified that

Summers began "kissing [her] and telling [her] how bad he wanted it." (Tr. at 35). The victim testified that Summers pulled her dress up and "went in" then made her perform oral sex on him. (Tr. at 36). The victim testified that after the incident Summers called her to remind her not to tell anyone. (Tr. at 36).

[*P18] The victim testified to similar incidents that happened where Summers would tell her how "he needed it" and that "[h]e couldn't keep it under control anymore[.]" The victim testified that Summers made threats to get her to meet him and that she met him at her sister's house where they had sexual intercourse. (Tr. at 37-38).

[*P19] The victim testified that near the end of July in the summer of 2010 she began dating another high school student and Summers was angry when he found out about it. (Tr. at 40-41). The victim testified that when Summers learned about the victim's boyfriend he told her that she had to meet him so they met out at Dull Road in Mercer County. (Tr. at 41). The victim testified that Summers was screaming at her and telling her how she should "have clearly known that [she] was his[.]" (*Id.*) The victim testified that Summers had a knife with him, and that he was "rubbing it up and down [her] leg and telling [her] that [she] needed a reminder of who [she] belonged to." (Tr. at 41). The victim testified that Summers then took the knife and carved his first initial, "C," in the inside of her right ankle. (Tr. at 42). The victim testified that she begged Summers not to before he did it, but he did anyway and then made her clean up the blood. (Tr. at 42).

[*P20] The victim testified that Summers took her phone while on Dull Road and sent a message from her phone to his saying, "I won't cut myself again," making it look like she had cut herself. (Tr. at 43). The victim testified that before she left that night the two had sexual intercourse again. (Tr. at 43). The victim testified that she did not tell anyone about the incident, stating that "at that point he had raped [her] and had cut [her], and [she] knew he was capable of just about anything if he was willing to do that." (Tr. at 44).

[*P21] The victim testified to another incident where her parents traveled out of town and Summers learned of it and came to her house. (Tr. at 45-46). She testified that Summers penetrated her anally and then forced her to orally pleasure him afterward. (Tr. at 46-47). The victim testified that the incident made her sick, that it "was hard to breathe" and "hard to walk." (Tr. at 47).

6

[*P22] The victim testified that incidents then started happening during school when basketball started her junior year. According to the victim multiple incidents occurred where Summers digitally penetrated her on the bus under a blanket to and from games. (Tr. at 48). The victim also testified that during practice Summers called her into the locker room to yell at her for lying to him about where she had been over the weekend, and that Summers initiated sexual intercourse with her in the locker room. (Tr. at 50). The victim testified that Summers told her that "we wouldn't want you to hurt yourself again and cut yourself again, would we?" (Tr. at 51). The victim testified that Summers occasionally would have sex with her after basketball practices during her junior year as well, that she felt forced to do so, and that it happened five to ten times. (Tr. at 52).

[*P23] The victim testified to an incident in January of 2011 where Summers found out she was still dating her boyfriend and Summers got angry. (Tr. at 53). Summers told the victim that she "needed a reminder that [she] belonged to him." (*Id*.) The victim testified that Summers then cut into her ankle again, and retraced the "C" he had cut into her before. (*Id*.) The victim testified that at the date of trial she still had a scar from Summers cutting her.

[*P24] The victim then testified that similar sexual incidents continued to occur through her junior year of high school into her senior year and through high school graduation in 2012. (Tr. at 58). She testified that the summer after graduation Summers' wife found out and started threatening her. (*Id*.) The victim testified that despite Summers' wife finding out, Summers would continue to message her, telling her that he needed to meet her, expressing that he was going to kill himself. (Tr. at 60). The victim testified that Summers had said before that he had contemplated suicide and that if he did kill himself he was going to take the victim with him. (Tr. at 60). The victim also testified that other times Summers said he would leave a suicide note "making sure that [she] was blamed for it." (Tr. at 60). The victim testified that she continued to get phone calls and threats from both Summers and his wife. (Tr. at 61).

[*P25] The victim testified that the sexual contact continued to occur when she was at college until October of 2012. She testified that Summers told her he was going to "ruin" her, and do "whatever it took." (Tr. at 64). The victim testified that Summers sent her pictures of her boyfriend's house, and told the victim that he was going to hurt a member of her family. (Tr. at 64).

7

> **[\*P26]** The victim testified that she was having trouble sleeping and eating, so she finally told her mother about the incidents. (Tr. at 65). The victim testified that afterward she went with her mother and spoke to the police.

The court of appeals affirmed the conviction and sentence. *State v. Summers*, 2014-Ohio-4538, 2014 Ohio App. LEXIS 4448 (3rd Dist. Oct. 14, 2014), appellate jurisdiction declined, 142 Ohio St. 3d 1450 (2015).

On October 10, 2014, Summers filed a petition for post-conviction relief under Ohio Revised Code § 2953.21 raising two claims of ineffective assistance of trial counsel in plea bargaining and sentencing. The trial court denied the petition, the court of appeals affirmed (State Court Record, ECF No. 7-1, PageID 471, et seq.), and the Ohio Supreme Court again declined jurisdiction.

On January 7, 2015, Summers filed an application to reopen his direct appeal to raise a claim of ineffective assistance of appellate counsel which the court of appeals denied. *Id.* at PageID 682, et seq. The Ohio Supreme Court again declined jurisdiction and Petitioner filed the instant habeas corpus petition.

# Analysis

## Ground One: Ineffective Assistance of Trial Counsel in Plea Negotiations

In his First Ground for Relief, Summers asserts he received ineffective assistance of trial counsel during plea negotiations in (1) misrepresenting the law, (2) promising a much lower sentence without a good faith basis to make that promise, and (3) refusing to cross-examine the

complaining witness before entering into plea negotiations.

The governing standard for ineffective assistance of counsel is found in *Strickland v. Washington*, 466 U.S. 668 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. at 687. In other words, to establish ineffective assistance, a defendant must show both deficient performance and prejudice. *Berghuis v. Thompkins*, 560 U.S. 370, 389 (2010), *citing Knowles v. Mirzayance*, 556 U.S. 111 (2009).

With respect to the first prong of the *Strickland* test, the Supreme Court has commanded:

> Judicial scrutiny of counsel's performance must be highly deferential. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

466 U.S. at 689.

As to the second prong, the Supreme Court held:

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

> proceeding would have been different.  A reasonable probability is
> a probability sufficient to overcome confidence in the outcome.

466 U.S. at 694.  *See also Darden v. Wainwright*, 477 U.S. 168 (1986); *Wong v. Money*, 142

F.3d 313, 319 (6th Cir. 1998); *Blackburn v. Foltz*, 828 F.2d 1177 (6th Cir. 1987).  *See generally*

Annotation, 26 ALR Fed 218.

There is a constitutional right to the effective assistance of counsel in the plea bargain

process which includes the duty of an attorney to communicate an offered plea bargain.

*Missouri v. Frye*, 566 U.S. 134 (2012); *Lafler v. Cooper*, 566 U.S. 156 (2012).    The *Strickland*

standard applies in evaluating ineffective assistance claims in cases which resulted in a

negotiated plea.  *Hill v. Lockhart*, 474 U.S. 52, 57 (1985); *Sparks v. Sowders*, 852 F.2d 882, 884

(6th Cir. 1988).  In order to satisfy the "prejudice" prong of *Strickland* in a negotiated plea case,

the defendant must show that there is a reasonable probability that, but for counsel's errors, he

would not have pleaded guilty or no contest and would have insisted on going to trial.  *Hill*, 474

U.S. at 58.  Moreover, he must show that there would have been a reasonable chance he would

have been acquitted had he gone to trial. *Id.* at 59.

"The test is objective, not subjective." *Plumaj v. Booker*, 629 Fed. Appx. 662 (6th Cir.

2015), *quoting Pilla v. United States*, 668 F.3d 368, 373 (6th Cir. 2012).  To obtain relief, [a

petitioner] "must convince the court that a decision to reject the plea bargain would have been

rational under the circumstances." *Padilla v. Kentucky*, 559 U.S. 356, 372 (2010). The rationality

of such a rejection is typically based on multiple factors, including the strength of the evidence

against a defendant, the lack of viable defenses, and the benefits of the plea bargain. See *Pilla*,

668 F.3d at 373; *Haddad v. United States*, 486 F. Appx 517, 522 (6th Cir. 2012).  There is an

established deference that is afforded trial counsel in the area of plea bargaining. *Bray v.*

*Andrews*, 640 F.3d 731, 738 (6th Cir. 2011).

10

When a state court decides on the merits a federal constitutional claim later presented to a federal habeas court, the federal court must defer to the state court decision unless that decision is contrary to or an objectively unreasonable application of clearly established precedent of the United States Supreme Court. 28 U.S.C. § 2254(d)(1); *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 785 (2011); *Brown v. Payton*, 544 U.S. 133, 140 (2005); *Bell v. Cone*, 535 U.S. 685, 693-94 (2002); *Williams (Terry) v. Taylor*, 529 U.S. 362, 379 (2000).

Summers argues the Ohio court's decision is not entitled to deference under § 2254(d)(1) because "the Ohio courts did not consider the federal constitutional claims he asserted, but rather ruled solely upon the issues under state law," referencing the Common Pleas decision, the court of appeals affirmance, and the Ohio Supreme Court entry declining jurisdiction (Reply, ECF No. 15, PageID 866).

Where there has been one reasoned state court judgment rejecting a federal claim, there is a rebuttable presumption that later unexplained orders upholding the judgment or rejecting the same claim rest on the same ground. *Ylst v. Nunnemaker*, 501 U.S. 797 (1991). The district court must look at the last state court disposition providing reasons for the decision. *Joseph v. Coyle*, 469 F.3d 441, 450 (6th Cir. 2006); *Couch v. Jabe*, 951 F.2d 94, 96 (6th Cir. 1991). A state court's noncommittal denial of review is not controlling. *McBee v. Abramajtys*, 929 F.2d 264, 267 (6th Cir. 1991). Therefore it is the court of appeals opinion which must be examined under the § 2254(d)(1) standard.

In rejecting this claim, the Third District Court of Appeals expressly applied *State v. Carter*, 72 Ohio St. 3d 545, 558 (1995), where the Ohio Supreme Court held

> [j]udicial scrutiny of counsel's performance is to be highly deferential, and reviewing courts must refrain from second-guessing the strategic decisions of trial counsel. To justify a finding of ineffective assistance of counsel, the appellant must

> overcome a strong presumption that, under the circumstances, the
> challenged action might be considered sound trial strategy.

That language is a direct quotation from *Strickland*, *supra*, in which the Ohio Supreme Court acknowledges that *Strickland* sets the constitutional standard for ineffective assistance of trial counsel claims.  The court of appeals also cites *State v. Bradley*, 42 Ohio St. 3d 136 (1989), *State v. Waddy*, 63 Ohio St. 3d 424 (1992), and *State v. Barnett*, 2013-Ohio-2496 (3rd Dist. 2013), all for their application of relevant United States Supreme Court law.  Because the Third District used federal standards embedded in state case law, particularly *Strickland*, in adjudicating this claim, its decision is entitled to be reviewed under the deferential § 2254(d)(1) standard and not de novo as Summers requests.

Summers also asserts the factual findings by the state courts were "clearly erroneous, particularly given the uncontroverted nature of the record, and need not be followed by this Court."  (Reply, ECF No. 15, PageID 866.)  Under 28 U.S.C. § 2254(d)(2), a decision by a state court may be set  aside if the state court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings."  The Ohio courts' conclusions must be reviewed under that standard, rather than a "clearly erroneous" standard which would apply, for example, on a direct appeal.

Summers' claims of ineffective assistance of trial counsel are based on facts outside the record on direct appeal but presented to the trial court as evidence on the petition for post-conviction relief.  Because of that, the Third District found error in the trial court's res judicata conclusion.  *State v. Summers*, Case No. 10-15-15 (3rd Dist. Mar. 14, 2016)(unreported, copy at ECF No. 7-1, PageID 483-84)(hereinafter "Summers PC App.").

The evidentiary record before the Ohio courts consisted entirely of affidavits from family

members and other supporters of the Petitioner; they were able to report comments by trial counsel because they were all present for the trial. Although Ohio law provides for the possibility of a live testimony evidentiary hearing in post-conviction, Summers moved for summary judgment on the basis of those affidavits (Judgment Entry, ECF No. 7-1, PageID 393). In evaluating evidence presented in that way, the trial judge followed the guidance of the Ohio Supreme Court in *State v. Calhoun*, 86 Ohio St. 3d 279 (1999). There the court noted that affidavits "should not lightly be deemed false," but should be carefully considered.

> In determining the credibility of supporting affidavits in postconviction relief proceedings, we adopt the reasoning of the First Appellate District in *State v. Moore* (1994), 99 Ohio App. 3d 748, 651 N.E.2d 1319. The court, in *Moore*, cited *Sumner*, and suggested that a trial court, in assessing the credibility of affidavit testimony in so-called paper hearings, should consider all relevant factors. *Id.* at 754, 651 N.E.2d at 1323. Among those factors are (1) whether the judge reviewing the postconviction relief petition also presided at the trial, (2) whether multiple affidavits contain nearly identical language, or otherwise appear to have been drafted by the same person, (3) whether the affidavits contain or rely on hearsay, (4) whether the affiants are relatives of the petitioner, or otherwise interested in the success of the petitioner's efforts, and (5) whether the affidavits contradict evidence proffered by the defense at trial. Moreover, a trial court may find sworn testimony in an affidavit to be contradicted by evidence in the record by the same witness, or to be internally inconsistent, thereby weakening the credibility of that testimony. *Id.* at 754-756, 651 N.E.2d at 1323-1324.
>
> Depending on the entire record, one or more of these or other factors may be sufficient to justify the conclusion that an affidavit asserting information outside the record lacks credibility. Such a decision should be within the discretion of the trial court. A trial court that discounts the credibility of sworn affidavits should include an explanation of its basis for doing so in its findings of fact and conclusions of law, in order that meaningful appellate review may occur.

86 Ohio St. 3d at 284-85. In applying *Calhoun*, the trial judge noted he was the same judge who presided at trial, that the affidavits contained similar content and hearsay, that they were from

relatives or friends, and that they contradicted in part what was said in the plea colloquy and sentencing hearing (Decision, ECF No. 7-1, PageID 397). The judge went on to conclude that the evidence which had been presented up to the time the plea was taken "appeared to overwhelmingly establish that Summers was guilty beyond a reasonable doubt of crimes beyond those to which he" pled. *Id.* at 397-98. The judge further found that if Summers had continued with trial, he would probably have been "found guilty of additional crimes and received a sentence more severe than the sentence of a twenty-year stated prison term for the eight sexual battery offenses he admitted committing. . . ." *Id.* at PageID 398.

On appeal, the Third District confirmed the applicability of *Calhoun* and noted how the affidavits ran counter to Summers' statements in the plea colloquy. *Summer PC App.* at PageID 479. It concluded:

> Not only are the affiants' accounts inconsistent, but they lack context. For example, it is true that the State may have been able to re-indict Summers on the dismissed counts of rape if he did not accept the State's offer. It is also true that the State could not have re-indicted Summers on the dismissed counts under the terms of the plea agreement. Finally, it is true that, for purposes of R.C. 2907.03(A)(7), it is immaterial whether the jury believed the sexual conduct between Summers and the victim was consensual.

*Id.* at PageID 481.

The court of appeals decision is not based on an unreasonable determination of the facts. It recites accurately what the affiants' said. Nor is it an unreasonable evaluation of those affidavits. For instance, the statements about rape are equivocal. The Third District confirmed that in fact, under Ohio law, Summers could have re-indicted Summers for rape as statutorily defined. But more critically, it appeared to trial counsel that the jury was accepting the victim's testimony and might therefore have been inclined to regard the sexual conduct that happened as non-consensual, thereby leading it to be more likely to convict. While the existence of consent

14

as between a teacher and student is technically irrelevant, the distinction is quite rhetorically powerful. Summers was permitted to plead to about one-fifth of the sexual battery charges.[1] There is no better evidence than the opinion of the trial judge that, had the trial continued, the jury would have convicted on far more than eight counts and the judge would have sentenced more harshly yet. The testimony about the felonious assault conduct – cutting a "C" into the victim's ankle with a knife not once but twice – could have been particularly compelling.

As part of his First Ground for Relief, Summers claims that his trial attorney "refused" to cross-examine the victim before the plea offer was accepted. Counsel then recounts a number of items of evidence which could have been used in that cross-examination to discredit the victim's testimony (Reply, ECF No. 15, PageID 872-74). Post-conviction counsel's declaration authenticates cell phone and text message extracts, a medical report, color photographs regarding the ankle wound, and video recordings of police interviews of the victim as having been in trial counsel's file and therefore available to him for impeachment.

Summers Affidavit in post-conviction paints a somewhat different picture (ECF No. 7, PageID 211-19). First of all, plea negotiation was not a sudden mid-trial development; Summers confirms that there had been offers and counter-offers well before trial. Second, he confirms the timing of the negotiations that ultimately resulted in a plea: the victim had already testified but not yet been cross-examined and the State was nearly finished with its case in chief. Trial counsel had concluded that the jury was accepting the victim's testimony which was, of course, the key to the case. If that was true, and the trial judge later said he thought it was, then Summers' exposure was much greater than on the eight counts he pleaded to. Summers complains that Mr. Howell relied on the fact that the victim had characterized at least some of

---

[1] The Court recognizes that, upon conviction, many of those counts would likely have merged under Ohio Revised Code § 2941.25.

what happened as rape, but fails to acknowledge what the impact of that would have been on the jury.  Summers also complains that Howell had not used the impeachment material referenced above (Affidavit,  ECF No. 7, PageID 217, ¶ 21), but fails to acknowledge that such material could only have been used during cross-examination.  In sum, the statements in Summers' Affidavit do not support the conclusion that Howell "refused" to cross-examine the victim. Rather, even taken at face value, they only support the conclusion that Mr. Howell very strongly urged Summers to take the plea offer and to do so quickly before it was withdrawn.  Under the circumstances, this does not appear to have been deficient advice.

Summers' First Ground for Relief also claims Howell gave deficient advice regarding sentencing that he had no good faith basis for believing was accurate.  No evidence is offered to support this conclusion.  That is, while there are repeated affidavit assertions about Howell's predicting a much more lenient sentence than the one actually imposed, there is no fact-based assertion that this particular judge is known to be a harsh sentencer in sexual abuse of minor cases.

Summers and his supporters also assert Howell told them sentences on the eight counts would be concurrent rather than consecutive.  Summers admits in his Affidavit what is corroborated by the plea colloquy transcript, to wit, that the trial judge told him the sentence could be up to forty years, which would have been the result of imposing maximum consecutive sentences.  Again, no evidentiary basis is offered to undercut Mr. Howell's prediction that the sentences would likely be concurrent.  Summers is bound by his admission, before his plea was accepted, that he understood the maximum, even if Howell did not advise him of it.

The First Ground for Relief also fails on the prejudice prong of *Strickland*.  The trial judge evinced in his post-conviction opinion his belief that the jury would have convicted on far

more than eight counts and that, had that happened, he would have imposed a more severe sentence.

The Third District's decision on the issues in Ground One is not an objectively unreasonable application of *Strickland v. Washington* and it is therefore entitled to deference under § 2254(d)(1). The First Ground for Relief should be denied on the merits.

**Ground Two:  Ineffective Assistance of Trial Counsel in Sentencing**

In his Second Ground for Relief, Summers asserts he received ineffective assistance of trial counsel at sentencing when his trial attorney failed to introduce the impeachment evidence referenced above and also failed to call "numerous" additional favorable witnesses.

The only record reference given by Summers as to the additional witnesses who should have been called at sentencing is to PageID 218, a page of Summers' own Affidavit. At ¶ 24, in addition to mentioning the text messages he received from the victim and the medical expert report, Summers mentions "other witness statements and testimony to argue for a more favorable sentence at the sentencing hearing." Who those witnesses were or what they might have testified to is not revealed; no witness statements or possible testimony are mentioned in Attorney Kinsley's Declaration (ECF No. 7, PageID 229-230).

The Warden defends this claim on the merits (Return, ECF No. 10, PageID 839-42).

In affirming denial of this claim on appeal from denial of post-conviction relief, the Third District noted that at sentencing Summers took full responsibility for the sexual misconduct and said the victim was "entirely blameless." *Summers PC App.* at PageID 482. Two other witnesses, a former student of Summers and a friend, made statements about why the victim

might have been partially responsible.

It would certainly not have been a consistent sentencing strategy to essentially throw oneself on the mercy of the court, the effect of taking full responsibility, and then spend extensive time adverting to text messages to show the victim was partially responsible. Although Summers claims, correctly, that the text messages were not introduced at sentencing, he makes no claim that his attorney somehow coerced him into taking full responsibility.

Given Summers' abuse of trust reposed in him as a teacher and coach, taking responsibility was not a deficient strategy.  Summers' Second Ground for Relief is therefore without merit.


**Ground Three:  Ineffective Assistance of Appellate Counsel**


In his Third Ground for Relief, Summers asserts he received ineffective assistance of appellate counsel when his appellate attorney did not raise claims of ineffective assistance of trial counsel consisting of (1) failure to object to the victim's use of the word "rape" in her testimony when he was not charged with rape and other prejudicial evidence (presumably referring to the victim's testimony that Summers was convicted of driving under the influence of alcohol (See Reply, ECF No. 15, PageID 883)); (2) failure to move to dismiss duplicative and non-specific counts in the indictment; (3) failure to challenge the constitutionality of the Ohio sexual battery statute; and (4) failure to raise a proportionality argument at sentencing.

A criminal defendant is entitled to effective assistance of counsel on appeal as well as at trial, counsel who acts as an advocate rather than merely as a friend of the court. *Evitts v. Lucey*, 469 U.S. 387 (1985); *Penson v. Ohio*, 488 U.S. 75 (1988); *Mahdi v. Bagley*, 522 F.3d 631, 636

(6th Cir. 2008).  The *Strickland* test applies to appellate counsel.  *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Burger v. Kemp*, 483 U.S. 776 (1987).  To evaluate a claim of ineffective assistance of  appellate counsel, then, the court must assess the strength of the claim that counsel failed to raise. *Henness v. Bagley*, 644 F.3d 308 (6th  Cir. 2011), *citing  Wilson v. Parker*, 515 F.3d 682, 707 (6th   Cir. 2008). Counsel's failure to raise an issue on appeal amounts to ineffective assistance only if a reasonable probability exists that inclusion of the issue would have changed the result of the appeal. *Id*., *citing Wilson.*  If a reasonable probability exists that the defendant would have prevailed had the claim been raised on appeal, the court still must consider whether the claim's merit was so compelling that the failure to raise it amounted to ineffective assistance of appellate counsel. *Id., citing Wilson.* The attorney need not advance every argument, regardless of merit, urged by the appellant.   *Jones v. Barnes*, 463 U.S. 745, 751-752 (1983)("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues.")  Effective appellate advocacy is rarely characterized by presenting every non-frivolous argument which can be made. *Joshua v. DeWitt*, 341 F.3d 430, 441 (6th  Cir. 2003); *Williams v. Bagley*, 380 F.3d 932, 971 (6th  Cir. 2004), *cert. denied*, 544 U.S. 1003 (2005); *see Smith v. Murray*, 477 U.S. 527 (1986).

In denying Summers' Application to Reopen his Direct Appeal,[2] the Third District found no ineffective assistance of appellate counsel as to the claims made because "the first and second issue[s] raised in Appellant's motion are not relevant because he entered pleas of guilty and the third and fourth issue[s] were assigned as error and addressed in the direct appeal."  (Judgment Entry of Feb. 20, 2015, ECF No. 7-1, PageID 682.)

---

[2] An application under Ohio R. App. P. 26(B) to reopen the direct appeal is Ohio's remedy for claims of ineffective assistance of appellate counsel.  Such claims may not be brought in a petition for post-conviction relief under Ohio Revised Code § 2953.21.  *State v. Murnahan*, 63 Ohio St. 3d 60 (1992).

Regarding the first sub-claim of ineffective assistance of appellate counsel, Petitioner responds to the waiver argument by asserting this claim could not have been waived by a guilty plea (Reply, ECF No. 15, PageID 884, citing *United States v. Moye*, 170 Fed. Appx. 958 (6th Cir. 2006)).  *Moye* stands for the proposition for which it is cited, to wit, that a guilty plea does not waive the right to appeal a sentence.  But the Court fails to understand how *Moye* is relevant:  the fact that a sentence can be appealed after a guilty plea does not imply that a failure of counsel to object to testimony is not waived by a guilty plea.

A guilty or no contest plea renders irrelevant those constitutional violations not logically inconsistent with the valid establishment of factual guilt.  *Menna v. New York*, 423 U.S. 61 (1975).  "[A] voluntary and unconditional guilty plea 'bars any subsequent non-jurisdictional attack on the conviction.'"  *United States v. Corp*, 668 F.3d 379, 384 (6th Cir. 2012).  After entry of an unconditional guilty plea, the defendant may challenge only the court's jurisdiction and the voluntary and intelligent nature of the plea itself.  *United States v. Ferguson*, 669 F.3d 756, 763 (6th Cir. 2012).  A guilty plea constitutes a break in the chain of events leading up to it.  *Tollett v. Henderson*, 411 U.S. 258 (1973).  Federal habeas corpus review of claims raised by a petitioner who has entered a guilty plea is limited to "the nature of the advice and the voluntariness of the plea, not the existence as such of an antecedent constitutional infirmity."  *Tollett*, 411 U.S. at 266.  Assuming it was ineffective assistance of trial counsel to fail to object to the "rape" language or the DUI conviction, that ineffective assistance claim was waived by entry of the guilty plea, as the Third District held.

The same analysis also applies to the second claim of ineffective assistance of appellate counsel about failure to raise a claim of ineffective assistance of trial counsel for failure to move to dismiss duplicative counts in the indictment.

As to the third and fourth sub-claims of ineffective assistance of appellate counsel, the Third District concluded they were "assigned as error and addressed in the direct appeal." (Judgment Entry, ECF No. 7-1, PageID 682). Summers denies that his appellate attorney raised these two claims on direct appeal (Reply, ECF No. 15, PageID 887).

On direct appeal, Summers raised the following relevant Assignments of Error:

> **ASSIGNMENT OF ERROR  2**
>
> CONSECUTIVE SENTENCES CUMULATING [sic] IN A TERM OF TWENTY YEARS WAS NOT CONSISTENT WITH NOR PROPORTIONATE TO SENTENCES IMPOSED IN SIMILAR CASES FOR SIMILAR OFFENDERS.
>
> **ASSIGNMENT OF ERROR 3**
>
> OHIO SEXUAL BATTERY STATUTE 2907 AS APPLIED TO SCHOOL TEACHERS IS UNCONSTITUTIONAL AND VIOLATIVE OF THE EQUAL PROTECTION CLAUSE OF THE 14TH AMENDMENT.

*State v. Summers*, *supra.*   None of these Assignments argues that trial counsel provided ineffective assistance of trial counsel by not raising the issue, even though such a claim could have been raised on direct appeal because it would have been based on record evidence.

On Assignment of Error Two, which parallels the fourth ineffective assistance of appellate counsel sub-claim, the Third District wrote:

> [*P39] In Summers' second assignment of error, he argues that his aggregate 20 year prison term was not consistent with, nor proportionate to, sentences imposed in similar cases for similar offenders.
>
> [*P40] "A defendant alleging disproportionality in felony sentencing has the burden of producing evidence to 'indicate that his sentence is directly disproportionate to sentences given to other offenders with similar records who have committed these offenses * * *.'" *State v. Ewert*, 5th Dist. Muskingum No. CT2012-0002, 2012-Ohio-2671, ¶ 33, quoting *State v. Breeden*, 8th Dist. Cuyahoga No. 84663, 2005-Ohio-510, ¶ 81. If a defendant fails to

argue to the trial court that his sentence is not consistent with or proportionate to sentences imposed for similar crimes committed by similar offenders, then the defendant waives that issue for appeal. *State v. Norman*, 3rd Dist. Seneca No. 13-13-50, 2014-Ohio-3010, ¶ 17 citing *Ewert* at ¶ 31 (additional citations omitted).

[*P41] At the outset, we would note that Summers did not present this issue to the trial court, and therefore waived it for purposes of appeal. Nevertheless, even disregarding the waiver, Summers has not established that the trial court's sentence was disproportionate in this case. Summers was ordered to serve 30 months in prison on each of the eight sexual battery charges he pled guilty to, which was half of the maximum possible 60 month prison sentence for each conviction. As illustrated in the previous assignment of error, the trial court made findings to support the imposition of its sentence and specifically stated it had considered the requisite sentencing statutes.

[*P42] In addition to the trial court's findings, we would note the testimony of the victim presented at trial, which indicated that for a period of over two years Summers compelled the victim, who was his student, to repeatedly engage in sexual acts through constant threats. The testimony indicated that Summers went so far as to use a knife to carve his initial into the victim more than once so that she would be reminded "she was his." The victim also testified that Summers continually threatened her safety, the safety of her boyfriend and her family, and that Summers threatened to harm himself and blame the victim for it in order to compel her to engage in the sexual relationship.

[*P43] In arguing that his sentence was disproportionate, Summers relies heavily on *State v. Parker*, 193 Ohio App.3d 506, 2011-Ohio-1418, 952 N.E.2d 1159.[3] In *Parker*, the Second District Court of Appeals modified a defendant's sentence in a Sexual Battery case. In that case the court found that where the defendant was a first time offender and had only a very brief relationship with a student that did not involve any compulsion, a fifteen year prison sentence was excessive, especially since the trial court seemed to base its sentence on a desire to give the defendant a lengthy sentence to prevent him from having a relationship with the victim. *State v. Cameron*, 2nd Dist. No. 2012-CA-86, 2013-Ohio-4397, ¶¶ 16-17 (analyzing and distinguishing *Parker*).

[*P44] The case before us is clearly different than *Parker* for a wide variety of reasons. In Parker, the defendant and the victim only met twice and no sexual intercourse occurred, rather merely

22

digital penetration. Here, sexual intercourse occurred frequently seemingly whenever desired by Summers in addition to other sexual acts desired by Summers.

[*P45] In *Parker* there was no indication of force or compulsion. In fact, the victim in Parker believed that she was "in love" with the defendant. In the case before us the victim's testimony indicated severe threats from Summers, infliction of physical injury with a knife, and a heavy degree of compulsion to get the victim to engage in the sexual acts.

[*P46] Additionally, in *Parker* the defendant was charged with and pled guilty to four counts of Sexual Battery, which all occurred in a matter of weeks, whereas here Summers pled guilty to eight counts of Sexual Battery and the crimes spanned over two years.

[*P47] Finally, in *Parker* there was a clear indication that the prison term was set primarily to get a desired future result, namely to prevent any possible relationship between the defendant and the victim. There is no such indication from the record before us that the trial court had a specific goal and created a "sentencing package" to achieve that goal. Thus Parker is clearly distinguishable from the case before us.

[*P48] Accordingly, based on all the facts and circumstances of this case, even if Summers had not waived this claim, we cannot find that the trial court's sentence was disproportionate as it was supported in the record and Summers has not met his burden establishing that the sentence was disproportionate. Therefore Summers' second assignment of error is overruled.

*State v. Summers*, *supra*. Thus although the Third District noted trial counsel's failure to raise this claim, it did not hold that waiver against Summers and went on to do a full merits analysis of the proportionality claim.[3] Summers has failed to show that failure to raise this issue by way of a direct appeal claim of ineffective assistance of trial counsel would have made any difference to the outcome since the Third District analyzed the claim on the merits. To put it a different way, it can hardly be ineffective assistance of appellate counsel to fail to raise a claim of ineffective

---

[3] Summers asserts the Third District conducted a "plain error" review (Reply, ECF No. 15, PageID 888). "Plain error" is a term of art in Ohio law which involves a stricter standard of review. The Third District does not use the term. It appears instead to have conducted a merits review in the alternative.

assistance of trial counsel for omission to object when the appellate court does not hold the failure to object against the defendant-appellant. Appellate counsel's argument on the merits was a stronger claim on appeal than the ineffective assistance of trial counsel claim would have been.

Assignment of Error Three parallels the third sub-claim of ineffective assistance of appellate counsel, to wit, that appellate counsel did not assert ineffective assistance of trial counsel for trial counsel's failure to argue that the Ohio sexual battery statute was unconstitutional. On that Assignment of Error, the Third District wrote:

> [*P49] In Summers' third assignment of error, he argues that the Sexual Battery statute as applied to school teachers, R.C. 2907.03(A)(7), is unconstitutional.

> [*P50] Initially we would note that Summers failed to make the argument that R.C. 2907.03(A)(7) was unconstitutional at the trial court level. The "[f]ailure to raise at the trial court level the issue of the constitutionality of a statute or its application, which is apparent at the time of trial, constitutes a waiver of such issue and a deviation from this state's orderly procedure, and therefore need not be heard for the first time on appeal." *State v. Awan*, 22 Ohio St.3d 120, 22 Ohio B. 199, 489 N.E.2d 277 (1986), syllabus. Thus Summers has waived this argument for this appeal [footnote omitted].

> [*P51] Nevertheless, this exact challenge was previously addressed by the Ninth District Court of Appeals in *State v. Shipley*, 9th Dist. Lorain No. 03CA008275, 2004-Ohio-434, ¶¶ 80-81. In *Shipley*, the Ninth District conducted the following analysis.

> > R.C. 2907.03(A)(7) specifically penalizes teachers, administrators, coaches and other individuals in a position of authority with a public school for an act for which other individuals, not encompassed within another part of the same statute, would not be penalized. See R.C. 2907.03 and 2907.04. The legislature explained in enacting the statute that it intended to protect individuals in a variety of situations where another might take unconscionable advantage of that individual. See 1974 Committee Comment to R.C. 2907.03(A)(7). In 1994, the

legislature amended the statute to include 2907.03(A)(7) in response to a case which held that teachers did not fall under any of the classifications in the prior statute. See *State v. Noggle*, 67 Ohio St.3d 31, 1993-Ohio-189, 615 N.E.2d 1040.

In this case, R.C. 2907.03(A)(7) is rationally related to its intended purpose of preventing teachers from taking unconscionable advantage of students by using their undue influence over the students in order to pursue sexual relationships. Defendant has failed to show that the statute bears no rational relationship to a legitimate government interest.

*Shipley*, ¶¶ 80-81.

[*P52] Thus even if Summers' argument was not waived, we concur with the Ninth District's assessment in *Shipley* as there appears to be a clear rational basis for the statute. Summers has in no way demonstrated that the strong presumption of constitutionality afforded to statutes has been overcome in this case. Accordingly, Summers' third assignment of error is overruled.

*State v. Summers*, *supra*. Although the court said more about waiver on this assignment of error than on the second, it nevertheless proceeded to a merits determination and did not hold the waiver against Summers. As with the prior subclaim, Summers was in no way prejudiced by his appellate attorney's failure to structure this claim as an ineffective assistance of trial counsel claim.

In sum, Summers' Third Ground for Relief is without merit and should be dismissed with prejudice.

## Ground Four:  Disproportionate Sentence in Violation of the Eighth Amendment

In his Fourth Ground for Relief, Summers asserts his aggregate sentence of twenty years

25

imprisonment for eight counts of sexual battery is unconstitutionally disproportionate to his criminal conduct, in violation of the Eighth Amendment.

Summers' entire argument on this Ground for Relief reads:

> For the reasons set forth above, Summers' 20-year sentence was grossly disproportionate to sentences handed out against similarly-situated offenders. While Summers concedes that his argument was not raised as a federal constitutional claim before the Ohio court of appeals because of the ineffectiveness of his appellate lawyer, this Court may waive exhaustion in the interests of justice. See *Granberry v. Greer*, 481 U.S. 129, 130-1 (1987). Given the severity of Summers' sentence and the wide gap between the 20 years he received and the typically low sentences imposed on other similar offenders, the Court should excuse Summers' nonexhaustion and should consider this claim on its merits.

(Reply, ECF No. 15, PageID 889.)

This argument is unpersuasive for a number of reasons.  First, the Court cannot find any place in the Reply  "above"  where Summers' counsel sets forth reasons for believing that this sentence was disproportionate. At PageID 880, counsel states that the sentence is "believed to be the longest term of imprisonment ever imposed on a teacher convicted of a consensual sexual affair with a student in the State of Ohio. (PAGEID 293)."  The referenced PageID 293 purports to be a list of sentences for sexual battery imposed in Ohio.  It is attached as Exhibit F to the Petition for post-conviction relief filed in the Common Pleas Court on October 10, 2014.  The only explanation of the exhibit appears at page 10 of the Petition where it is cited to support the same "believed to be" statement made above (PageID 209). Who created this exhibit from what data sources?

Second, reaching the merits of this claim would not be a matter of excusing a failure to exhaust state court remedies.  Failure to exhaust occurs when there is still an available state court remedy that could be exhausted.  Rather, this claim is procedurally defaulted.  As the warden

points out (Return, ECF No. 10, PageID 847), trial counsel did not object on this ground and therefore forfeited it under Ohio's contemporaneous objection rule.  Ohio's contemporaneous objection rule — that parties must preserve errors for appeal by calling them to the attention of the trial court at a time when the error could have been avoided or corrected, set forth in *State v. Glaros*, 170 Ohio St. 471 (1960), paragraph one of the syllabus; *see also State v. Mason*, 82 Ohio St. 3d 144, 162 (1998) — is an adequate and independent state ground of decision. *Wogenstahl v. Mitchell*, 668 F.3d 307, 334 (6th Cir.  2012), *citing Keith v. Mitchell*, 455 F.3d 662, 673 (6th Cir. 2006); *Goodwin v. Johnson*, 632 F.3d 301, 315 (6th Cir. 2011); *Smith v. Bradshaw*, 591 F.3d 517, 522 (6th Cir. 2010); *Nields v.  Bradshaw*, 482 F.3d 442 (6th Cir.  2007); *Biros v. Bagley*, 422 F.3d 379, 387 (6th Cir. 2005);  *Mason v. Mitchell*, 320 F.3d 604 (6th Cir. 2003), *citing  Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001); *Scott v. Mitchell*, 209 F.3d 854 (6th Cir. 2000), *citing Engle v. Isaac*, 456 U.S. 107, 124-29 (1982).  *See also Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000); *Goodwin v. Johnson*, 632 F.3d 301, 315 (6th Cir. 2011); *Smith v. Bradshaw*, 591 F.3d 517, 522 (6th Cir.), *cert. denied*, 562 U.S. 876 (2010).

To excuse a procedural default, a habeas petitioner must show cause and prejudice. Summers has already argued that his trial counsel's ineffectiveness is adequate cause, but, as noted above, the Third District considered this claim on the merits, so there is no prejudice.

Although Summers argues this Court should excuse his procedural default (characterized as a failure to exhaust) and although the Warden makes an argument on the merits (Return, ECF No. 10, PageID 850-55), Summers makes no merits argument in his Reply.

Ground Four should be dismissed as procedurally defaulted.

**Ground Five:   The Ohio Teacher-Student Sexual Battery Statute Violates the Equal Protection Clause**

In his Fifth Ground for Relief, Summers argues that Ohio's statute which penalizes consensual sex between certain classes of people associated with public schools and students in those schools violates the Equal Protection Clause of the Fourteenth Amendment.

The Warden's counsel appear not to have notice that this claim was made:  the Return makes no reference to it and indeed calls the Fourth Ground for Relief Summers' "final claim." (Return, ECF No. 10, PageID 847).

The Third District decided this claim on the merits, as noted above.  Thus to prevail on his Fifth Ground for Relief, Summers must show that decision was contrary to or an objectively unreasonable application of Supreme Court precedent.

The sole precedent cited by Summers is *Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1985).  In that case the Supreme Court refused to recognize the mentally retarded (now more respectfully referred to as the intellectually disabled) as a quasi-suspect class for equal protection purposes.   Instead, it held a zoning ordinance which discriminated against the intellectually disabled had no rational basis.  The Court stated the general rational basis test as follows:

> The Equal Protection Clause of the Fourteenth Amendment commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws," which is essentially a direction that all persons similarly situated should be treated alike. *Plyler* v. *Doe*, 457 U.S. 202, 216 (1982). Section 5 of the Amendment empowers Congress to enforce this mandate, but absent controlling congressional direction, the courts have themselves devised standards for determining the validity of state legislation or other official action that is challenged as denying equal protection. The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest. *Schweiker* v. *Wilson*, 450 U.S. 221, 230 (1981); *United States Railroad*

*Retirement Board* v. *Fritz*, 449 U.S. 166, 174-175 (1980); *Vance* v. *Bradley*, 440 U.S. 93, 97 (1979); *New Orleans* v. *Dukes*, 427 U.S. 297, 303 (1976). When social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude, *United States Railroad Retirement Board* v. *Fritz, supra*, at 174; *New Orleans* v. *Dukes, supra*, at 303, and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes.

473 U.S. at 439-40.

Ohio Revised Code § 2907.03 creates the crime of sexual battery, a felony of the third degree with certain exceptions making it more penal. As applied to Summers, it provides:

> (A) No person shall engage in sexual conduct with another, not the spouse of the person, when . . . (7) The offender is a teacher, administrator, coach, or other person in authority employed by or serving in a school for which the state board of education prescribes minimum standards pursuant to division (D) of section 3301.07 of the Revised Code, the other person is enrolled in or attends that school, and the offender is not enrolled in and does not attend that school.

Summers argues this section makes an irrational distinction between teachers who engage in consensual sexual relations with students and other adults who engage in the same conduct, including "other adults in occupations of supervision over students, including business owners employing high school students and clergy in religious organizations that involve students." (Reply, ECF No. 15, PageID 889.)

First of all, Summers reads the statute too narrowly. Ohio Revised Code § 2907.03(A)(5) applies the same felony classification to consensual sexual conduct between persons and their parents or other persons *in loco parentis*. (A)(6) makes it a felony for such conduct to occur between someone in custody of law or a patient in a hospital and a person with supervisory or disciplinary authority over the other. (A)(9) applies the same prohibition if the victim is a minor and the other is a teacher, administrator, or coach in an institution of higher learning. (A)(11)

29

applies to persons confined in detention facilities and those employed by the facility. (A)(12) applies the prohibition to clerics and members of their congregations. Thus the class of persons defined for punishment under the sexual battery statute is much broader than teachers or coaches.

Summers is correct that the statute does not apply to all persons with "authority" over minors. However, there is a completely rational basis for the classes of persons protected under this statute: all are subject to continued pervasive exercise of authority by the class of potential offenders. A student assigned to a particular school is obliged by the school attendance law to be there five days a week. A person in custody gets even less respite from the potential coercion of a legal custodian. Clerics, as we have learned from the clergy sexual abuse crisis in the church, have an authority which children are taught is God-given. The General Assembly has chosen, quite rationally, to provide this criminal protection for persons who are in routine day-to-day contact with persons who exercise State or Church created authority over them.

In an equal protection rational basis review, the burden is on the one attacking the governmental arrangement to negative every conceivable basis which might support it, whether or not the basis has a foundation in the record. *Heller v. Doe*, 509 U.S. 312 (1993).

Rational-basis review in equal protection analysis "is not a license for courts to judge the wisdom, fairness or logic of legislative choices." *FCC v. Beach Communication, Inc*., 508 U.S. 307 (1993). *See also*, *e.g.*, *Dandridge v. Williams*, 397 U.S. 471, 486 (1970). Nor does it authorize "the judiciary [to] sit as a super legislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." *New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) (per curiam). For these reasons, a classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity. *See*, *e.g.*, *Beach Communications*, *supra*, at 508

U.S. 307 (slip op., at 7); *Kadrmas v. Dickinson Public Schools*, 487 U.S. 450, 462 (1988); *Hodel v. Indiana*, 452 U.S. 314, 331-332 (1981); *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 314 (1976) (per curiam). Such a classification cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose. *See*, *e.g.*, *Nordlinger v. Hahn*, 505 U.S. 1 (1992); *Dukes*, *supra*, at 303. Further, a legislature that creates these categories need not "actually articulate at any time the purpose or rationale supporting its classification." *Nordlinger*, *supra*, at 505 U.S. 1 (slip op., at 13). *See also*, *e.g.*, *United States R. Retirement Bd. v. Fritz*, 449 U.S. 166, 179 (1980); *Allied Stores of Ohio, Inc. v. Bowers*, 358 U.S. 522, 528 (1959). Instead, a classification "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Beach Communications*, *supra*. *See also*, *e.g.*, *Nordlinger*, *supra*; *Sullivan v. Stroop*, 496 U.S. 478, 485 (1990); *Fritz*, *supra*, at 174-179; *Vance v. Bradley*, 440 U.S. 93, 111 (1979); *Dandridge v. Williams*, *supra*, at 484-485.

A State, moreover, has no obligation to produce evidence to sustain the rationality of a statutory classification. "[A] legislative choice is not subject to courtroom fact finding and may be based on rational speculation unsupported by evidence or empirical data." *Beach Communications*, *supra*. *See also*, *e.g.*, *Vance v. Bradley*, *supra*, at 111; *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 812 (1976); *Locomotive Firemen v. Chicago R.I. & P.R. Co.*, 393 U.S. 129, 139 (1968). A statute is presumed constitutional, *see supra*, at 6, and "the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it," *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973), whether or not the basis has a foundation in the record. Finally, courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between

means and ends.  A classification does not fail rational-basis review because it "'is not made with mathematical nicety or because in practice, it results in some inequality."' *Dandridge v. Williams, supra*, at 485, *quoting Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78 (1911). "The problems of government are practical ones and may justify, if they do not require, rough accommodations-illogical, it may be, and unscientific." *Metropolis Theatre Co. v. Chicago*, 228 U.S. 61, 69-70 (1913). *See also*, *e.g.*, *Burlington Northern R. Co. v. Ford*, 504 U.S. 648 (1992); *Vance v. Bradley, supra*, at 108, and n. 26; *New Orleans v. Dukes, supra*, at 303; *Schweiker v. Wilson*, 450 U.S. 221, 234 (1981).

Based on this authority, the Court cannot say it was irrational for the General Assembly to enact special protection from sexual misconduct for those under the pervasive supervision of potential sexual offenders.  Summers' Fifth Ground for Relief is therefore without merit.

**Conclusion**

Based on the foregoing analysis, it is respectfully recommended that the Petition be DISMISSED WITH PREJUDICE.  Because reasonable jurists would not disagree with this conclusion, Petitioner should be denied a certificate of appealability and the Court should certify to the Sixth Circuit that any appeal would be objectively frivolous and therefore should not be permitted to proceed *in forma pauperis*.

February 22, 2017.

s/ *Michael R. Merz*
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 153-55 (1985).